NO. 07-04-0261-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MAY 3, 2005
_____

IN THE INTEREST OF S.D.S., G.R.R., J.R.R., AND E.E.M.R., Minor Children
_____

FROM THE 223rd DISTRICT COURT OF GRAY COUNTY;

NO. 32,803; HON. PHIL N. VANDERPOOL, PRESIDING
_____

Before QUINN and CAMPBELL, JJ., and BOYD, S.J.[1]

This is an appeal from an order terminating the parent/child relationship between Cassandra Ann Ramirez and S.D.S., G.R.R., J.R.R. and E.E.M.R. The four children were sired by three different fathers, Filemon Sanchez, Johnny Sanchez, and David Rodriguez. Their relationship to their respective child or children was also terminated. However, only Cassandra, Filemon, and Johnny appealed the order; David did not. We affirm the order of termination.

### Cassandra's Appeal

Though Cassandra filed a notice of appeal, her appointed counsel submitted an *Ander's* brief.[2] Therein, he represents that no issues exist which are worthy of appeal.

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. TEX. GOV'T CODE ANN. §75.002(a)(1) (Vernon Supp. 2004-2005).

[2]*Anders v. California,* 386 U.S. 738, 744-45, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

Counsel notified Cassandra of this, sent her a copy of the brief, and informed her of her right to respond *pro se.* So too did this court notify her of same and the November 2004 deadline by which she had to act. To date, we have not received any response from her.

Upon our own independent review of the record, we conclude that the representations by counsel are well founded. There are no meritorious issues warranting the reversal of the trial court's order as it relates to Cassandra.

### Johnny's Appeal

Next, Johnny, the father of J.R.R., contends that the trial court erred in ordering termination because "no clear and convincing evidence" exists to support the trial court's findings. We overrule the issues.

#### Applicable Law

The applicable standard of review is discussed in *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002) and *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002). We refer the litigants to those cases for a discussion of same. Furthermore, it is clear that the decision before us may be affirmed if the evidence supports the existence of one statutory ground warranting termination, assuming, of course, that the State also proved that termination was in the best interest of the children. *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003); *In re P.E.W.,* 105 S.W.3d 771, 777 (Tex. App.–Amarillo 2003, no pet.).

Of the various statutory grounds upon which the trial court terminated Johnny's rights, one involved his engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child. TEX. FAM. CODE ANN. §161.001(1)(E) (Vernon 2002). To satisfy that ground, one need not prove that the children were the focus of the conduct or actually harmed by it. *In*

*re C.J.F.,* 134 S.W.3d 343, 351 (Tex. App.–Amarillo 2003, pet. denied). Rather, it is enough to simply show that the parent pursued a course of conduct having the effect of endangering the child. *Id.* at 352. Moreover, participating in intentional criminal activity while knowing that it could result in imprisonment can be such a course of conduct. *In re AWT,* 61 S.W.3d 87, 89-90 (Tex. App.–Amarillo 2001, no pet.); *see also Texas Dep't of Human Services v. Boyd,* 727 S.W.2d 531, 534 (Tex. 1987) (holding that if evidence, including that of imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of a child, termination under the similarly worded predecessor to §161.001(1)(E) could result); *Allred v. Harris County Child Welfare Unit,* 615 S.W.2d 803, 806 (Tex. Civ. App.–Houston [1st Dist.] 1980, writ ref'd n.r.e.) (wherein the parent-child relationship was terminated because, among other things, the father committed numerous crimes while on parole and knowing that their commission could result in the revocation of his parole). So too can imprisonment coupled with prior drug use support a finding under §161.001(1)(E). *In re K.C.,* 23 S.W.3d 604, 608 (Tex. App.–Beaumont 2000, no pet.).

Here, the record discloses that Johnny and Cassandra had a two-month relationship during which they lived with his grandparents. He not only was 21 or 22 at the time but also knew that she was 16. Yet, it was not during this brief interlude that Johnny impregnated Cassandra. Quite the contrary, Cassandra was actually pregnant with or just gave birth to G.R.R. at the time.[3] And, it was after the two "weren't together anymore" and Cassandra "was already with David [Rodriguez]" that Johnny impregnated her.

---

[3]Filemon Sanchez fathered G.R.R.

3

The offspring of Cassandra and Johnny, J.R.R., was born in December of 2001. And, despite being repeatedly informed by Cassandra that the child was his, Johnny did not believe her. This was so because she "was out running the streets" and he "didn't know who she was sleeping with at the time." Moreover, the last time he saw the child was in April of 2002, or approximately 15 months before being imprisoned in June of 2003.[4]

Johnny's incarceration arose from his possession of a controlled substance. This, however, was not his first entanglement with the law. In 1997, he was convicted of a state jail felony involving criminal mischief, while in 1998, he assaulted a police officer and tested positive for marijuana while on probation. And, regarding his use of controlled substances, he admitted to the trial court that he used both marijuana and cocaine.

Johnny would purport to minimize the nature of his conduct by arguing that much of it occurred before he determined that J.R.R. was his child. Authority does exist indicating that one's duty to provide for one's offspring arises when there is a court order, judicial admission, or an unequivocal acknowledgment for paternity. *See e.g., Djeto v. Texas Dep't Of Protective and Reg. Serv.*, 928 S.W.2d 96, 98 (Tex. App.–San Antonio 1996, no writ) (involving termination for failing to support and because the parent knowingly placed or allowed the child to remain in conditions or surroundings that endangered the child). Yet, there are multiple grounds upon which termination may be founded, and not all require the father to know of his paternity. For instance, it has been held that one need not know of his paternity to be susceptible to having his rights terminated due to his engagement in a course of conduct that endangers a child. *In re M.J.M.L.* 31 S.W.3d 347,

---

[4]We deduce that it was in April of 2002 since the child was born on December 18, 2001, and was four months old when last seen by Johnny. Four months from December 18th falls in the middle of April.

4

351 (Tex. App.–San Antonio 2000, pet. denied). More importantly, that was one of the grounds upon which the trial court acted at bar. Indeed, that he knowingly had sex with a minor who was not his spouse, used marijuana and cocaine, had a history of engaging in criminal conduct some of which involved violence, engaged in conduct resulting in his imprisonment, did nothing (for about 18 months) to verify or disprove Cassandra's representation that he fathered J.R.R., and left an infant (that he later verified as his) with someone who he knew was "out running the streets" provides ample basis for a reasonable factfinder to develop a firm conviction or belief that 1) Johnny knowingly engaged in conduct that endangered a child and 2) termination of the parental relationship would be in the best interests of J.R.R.[5]

### Filemon's Appeal

Like Johnny, Filemon also questions the sufficiency of the evidence underlying the trial court's decision to terminate the parent/child relationship. So too does he question whether he received the effective assistance of counsel because his trial attorney did not appeal the associate judge's report to the referring court. We overrule each issue.

### Termination of Parental Rights

Filemon was the first of at least three different men to impregnate Cassandra, and from their conjoining, S.D.S. was born. At the time of conception, Cassandra was 13 years old, while Filemon was "about sixteen, going on seventeen." And, though Cassandra originally misrepresented her age to him (she apparently said she was 15), Filemon knew

---

[5]Our opinion should not be read as imposing upon a male the duty to determine whether a child born of a woman with whom he had sex out of wedlock is his. Yet, we cannot ignore the connotations inherent in someone's refusal to even verify paternity when told he is the father.

her true age when the two again engaged in sex and conceived G.R.R., approximately 21 months after the birth of S.D.S.

Like Johnny, Filemon too "had [his] doubts" about whether he actually fathered G.R.R.; why he did went unexplained, however. Nevertheless, he made the discovery while he was in prison after being convicted for possessing a controlled substance, namely cocaine. The record discloses that he had been using controlled substances during the time Cassandra was pregnant with S.D.S. and thereafter. Moreover, this was not his only entanglement with the authorities. He admitted to being arrested "probably seven, eight times." So too had he been twice imprisoned since the birth of the first child, S.D.S.

At trial, Filemon represented that he did not want his paternal relationship with the two children ended. So too did he contend that he expressed interest in gaining custody of the children after his release from prison. Yet, he admitted that he was not ready to be a father to the children, though he was willing to become one. In his view, it would take him about six months to a year to assume that role, he told the trial court. So too did he propose that his children could live with and be cared for by his mother and step-father during the interim.

At the time of trial, Filemon worked in a car wash and sought day labor at construction sites to supplement his income. The supplement was needed to compensate for the child support he paid on behalf of S.D.S. However, none was paid on behalf of G.R.R. Moreover, he lacked a high school diploma. So too did he opt to forego enrollment in programs, while in prison, to further his education; when asked why, he said: "I really didn't care at the time."

6

Next, regarding his knowledge of the care provided by Cassandra, Filemon testified that he thought she was a good mother. Yet, he obviously knew that she was around 15 and living with her grandmother when he left her for prison. So too must he have known that she had dropped out of school.[6] And, whether he knew that his children went with their mother to live with a succession of other men who themselves engaged in criminal activity and went to prison is undeveloped. Yet, nothing of record indicates that Filemon made any effort to find that out. Nor does it indicate that he attempted to communicate with his two girls while in prison, though it is clear that he provided them with no support.[7] And, while between prison stints he saw G.R.R. once, he apparently did not know that both his children were infested with lice and had ringworm when the girls were taken into State custody. That he discovered after his release.

Since the intervention of the State and the placement of G.R.R. and S.D.S. with foster parents, they have become settled. G.R.R. grew healthy and happy. And, while S.D.S. was the "most damaged" girl ever to be placed in the care of her foster parent, she has improved. The youth now has friends, and talks and plays with others; that was not the situation when she first arrived. Then, the child was hysterical, would not want to sleep outside the sight of her foster mother, spoke little, and lacked physical contact. So too was she educationally delayed, a condition which since has improved.

_____

[6]She first dropped out in the seventh grade, "then went back in the eighth," and became pregnant and again "dropped out in the ninth."

[7]According to the record, Filemon's mother (Mrs. Perez) would sporadically visit the girls and provide them with diapers and clothes. Yet, that ended sometime or another after Cassandra moved and opted not to inform Mrs. Perez of her location.

Among the various grounds upon which Filemon's rights were terminated was that involving his engagement in conduct that endangered the physical or emotional well-being of the youths. *See* TEX. FAM. CODE ANN. §161.001(1)(E) (Vernon 2002). Abusing drugs, committing acts resulting in his imprisonment, failing to provide for or communicate with his children when in prison, opting not to further his education and thereby his ability to financially care for the youths, and leaving the girls with an uneducated mother who herself was little more than a child is evidence upon which the factfinder could reasonably develop a firm belief or conviction that the conditions of §161.001(1)(E) of the Family Code were satisfied. Add to this Filemon's own admission that he was not ready to be a father and that the girls had improved since being offered a better lot in life also forms basis upon which the same factfinder could reasonably develop a firm conviction that ending the parental relationship was in the best interests of S.D.S. and G.R.R.

*Ineffective Assistance of Counsel*

Finally, Filemon claims that he received ineffective assistance of counsel because his trial attorney failed to appeal the associate judge's order of termination to the referring court. In support of this argument, he contends that he was entitled "to challenge the associate judge's Order of Termination at every stage of the appellate process" and because the trial court found that appellate counsel was ineffective in failing to file an appellate brief, "it can be concluded that Appellant received ineffective assistance of counsel for failure to request a trial *de novo* to the referring court . . . ." Yet, assuming that the latter logically follows from the former, nothing is said about how the result would have differed had Filemon received a trial *de novo*. The evidence warranting the termination of his parental rights would not change; nor does he suggest that it would.

One claiming ineffective assistance of counsel must establish not only that his counsel was deficient but also that the deficiency was prejudicial. *In re M.S.,* 115 S.W.3d 534, 544 (Tex. 2003). And, the problem with the issue before us concerns the second prong to that test. Filemon has not attempted to illustrate how he was harmed by his attorney's conduct. Thus, he did not carry his burden of proof and, thus, we overrule the issue.

Having denied each issue before us, we grant the motion to withdraw of Cassandra's counsel and affirm the judgment of the trial court.


Brian Quinn
Justice